**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CENICA WILLIAMS<br>2585 Chesterton Drive<br>Lima, Ohio 45805, | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF** |
| LOWE'S HOME CENTERS, LLC<br>15775 U.S. 36 E<br>Marysville, Ohio 43040 | )<br>)<br>)<br>) | **JURY DEMAND ENDORSED<br>HEREIN** |
| **Serve Also:**<br>Lowe's Home Centers, LLC<br>Corporation Service Company<br>50 West Broad Street<br>Suite 1330<br>Columbus, Ohio 43215 | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendant. | ) | |

Plaintiff, Cenica Williams, by and through undersigned counsel, as his Complaint against

Defendant Lowe's Home Centers, LLC ("Defendant"), states and avers the following:

**PARTIES, VENUE, & JURISDICTION**

1. Williams is a resident of the city of Lima, Allen County, Ohio.

2. At all times herein, Williams was acting in the course and scope of his employment.

3. Defendant is a foreign limited liability company that does business at 15775 U.S. 36 E,

   Marysville, Union County, Ohio 43040 ("Marysville Location").

4. Defendant is and, at all times herein, was an employer within the meaning of R.C. § 4112.01

   *et seq.*

5. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Williams is alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 28 U.S.C. § 2000e.

6. All material events alleged in this Complaint occurred in Union County, Ohio.

7. This Court has supplemental jurisdiction over Williams's state law claims pursuant to 28 U.S.C. § 1367 as Williams's state law claims are so closely related to his federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

9. Within 300 days of the conduct alleged below, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-01742 against Defendant ("Williams EEOC Charge").

10. On or about January 5, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Williams regarding the Charges of Discrimination brought by Williams against Defendant in the Williams EEOC Charge.

11. Williams received his Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit A.

12. Williams has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

13. Williams has properly exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

14. Williams is a former employee of Defendant.

15. In or about February 2019, Williams began working for Defendant.

16. Defendant employed Williams as a commercial driver's license ("CDL") driver.

17. Williams worked at the Marysville Location.

18. Williams is African American.

19. During Williams's employment, there were multiple assistant managers at the Marysville Location.

20. During Williams's employment, Leo (Last Name Unknown) was an assistant manager at the Marysville Location.

21. Leo LNU is Caucasian.

22. Leo LNU did not participate in the decision to hire Williams.

23. During Williams's employment, Julie (Last Name Unknown) was an assistant manager at the Marysville Location.

24. Julie LNU is Caucasian.

25. Julie LNU did not participate in the decision to hire Williams.

26. During Williams's employment, Rhonda (Last Name Unknown) was an assistant manager at the Marysville Location.

27. Rhonda LNU is Caucasian.

28. During Williams's employment, Mary (Last Name Unknown) was an assistant manager at the Marysville Location.

29. Mary LNU is Caucasian.

30. Mary LNU did not participate in the decision to hire Williams.

31. Hereinafter, Leo LNU, Julie LNU, Rhonda LNU, and Mary LNU are collectively called the "Assistant Managers."

32. During Williams's employment, the Assistant Managers rarely called Williams by his name.

33. During Williams's employment, the Assistant Managers called Williams "Mr. Trouble."

34. The Assistant Managers did not call Williams's similarly-situated non-African-American coworkers "Mr. Trouble."

35. During Williams's employment, Leo LNU called Williams "Mr. Trouble."

36. Leo LNU did not call Williams's similarly-situated non-African-American coworkers "Mr. Trouble."

37. During Williams's employment, Julie LNU called Williams "Mr. Trouble."

38. Julie LNU did not call Williams's similarly-situated non-African-American coworkers "Mr. Trouble."

39. During Williams's employment, Rhonda LNU called Williams "Mr. Trouble."

40. Rhonda LNU did not call Williams's similarly-situated non-African-American coworkers "Mr. Trouble."

41. During Williams's employment, Mary LNU called Williams "Mr. Trouble."

42. Mary LNU did not call Williams's similarly-situated non-African-American coworkers "Mr. Trouble."

43. During Williams's employment, the Assistant Managers called Williams "Boy."

44. The Assistant Managers did not call Williams's similarly-situated non-African-American coworkers "Boy."

45. During Williams's employment, Leo LNU called Williams "Boy."

46. Leo LNU did not call Williams's similarly-situated non-African-American coworkers "Boy."

47. During Williams's employment, Julie LNU called Williams "Boy."

48. Julie LNU did not call Williams's similarly-situated non-African-American coworkers "Boy."

49. During Williams's employment, Rhonda LNU called Williams "Boy."

50. Rhonda LNU did not call Williams's similarly-situated non-African-American coworkers "Boy."

51. During Williams's employment, Mary LNU called Williams "Boy."

52. Mary LNU did not call Williams's similarly-situated non-African-American coworkers "Boy."

53. "Boy" is a common racist epithet used against African American men.

54. During Williams's employment, the Assistant Managers called Williams "Troublemaker."

55. The Assistant Managers did not call Williams's similarly-situated non-African-American coworkers "Troublemaker."

56. During Williams's employment, Leo LNU called Williams "Troublemaker."

57. Leo LNU did not call Williams's similarly-situated non-African-American coworkers "Troublemaker."

58. During Williams's employment, Julie LNU called Williams "Troublemaker."

59. Julie LNU did not call Williams's similarly-situated non-African-American coworkers "Troublemaker."

60. During Williams's employment, Rhonda LNU called Williams "Troublemaker."

61. Rhonda LNU did not call Williams's similarly-situated non-African-American coworkers "Troublemaker."

62. During Williams's employment, Mary LNU called Williams "Troublemaker."

63. Mary LNU did not call Williams's similarly-situated non-African-American coworkers "Troublemaker."

64. In or about September 2019, Williams heard a coworker ("John Doe") saying that he avoids being near Williams because "[Williams] has germs." ("Germs Comment").

65. John Doe is Caucasian.

66. Williams did not have any illness when John Doe made the Germs Comment.

67. John Doe did not make the Germs Comment about Williams's similarly-situated non-African-American coworkers.

68. Hereinafter, the Germs Comment, calling Williams "Mr. Trouble," calling Williams "Boy," and calling Williams "Troublemaker" are collectively called the "Racist Comments."

69. The Racist Comments were severe.

70. The Racist Comments were pervasive.

71. The Racist Comments created a hostile work environment on the basis of race.

72. In or about September 2019, Williams submitted a written report to Tracy Evans ("First Report of Discrimination").

73. Evans was a representative of Defendant's human resources department.

74. In the First Report of Discrimination, Williams reported the Racist Comments.

75. In the First Report of Discrimination, Williams reported that Defendant was discriminating against him on the basis of race.

76. Defendant has a policy against discrimination ("Discrimination Policy").

77. Defendant's Discrimination Policy precludes retaliation against employees who complain about discrimination.

78. Alternatively, retaliation against employees who complain about discrimination is permitted by Defendant.

79. Defendant's Discrimination Policy precludes intimidation against employees who complain about discrimination.

80. Alternatively, intimidation against employees who complain about discrimination is permitted by Defendant.

81. Defendant's Discrimination Policy requires employees to report what they reasonably believe is a violation of the Discrimination Policy.

82. Defendant's Discrimination Policy precludes retaliation against employees who report a violation of the Discrimination Policy.

83. Alternatively, retaliation against employees who report a violation of the Discrimination Policy is permitted by Defendant.

84. Defendant's Discrimination Policy precludes intimidation against employees who report a violation of the Discrimination Policy.

85. Alternatively, intimidation against employees who report a violation of the Discrimination Policy is permitted by Defendant.

86. The Racist Comments violate the Discrimination Policy.

87. Defendant has a policy to investigate reports of unsafe conditions.

88. Defendant has a policy to investigate reports of violations of its Discrimination Policy.

89. An investigation should include interviewing the complainant.

90. An investigation should include interviewing the subject of the complaint.

91. An investigation should include interviewing the subject of the reported discrimination.

92. An investigation should include interviewing witnesses to the reported discrimination.

93. An investigation should include getting a written statement from the complainant.

94. An investigation should include getting a written statement from the subject of the complaint.

95. An investigation should include getting a written statement from the subject of the reported discrimination.

96. In response to Williams's First Report of Discrimination, Defendant did not interview Williams.

97. In response to Williams's First Report of Discrimination, Defendant did not interview Leo LNU.

98. In response to Williams's First Report of Discrimination, Defendant did not interview Julie LNU.

99. In response to Williams's First Report of Discrimination, Defendant did not interview Rhonda LNU.

100. In response to Williams's First Report of Discrimination, Defendant did not interview Mary LNU.

101. In response to Williams's First Report of Discrimination, Defendant did not interview John Doe.

102. In response to Williams's First Report of Discrimination, Defendant did not interview witnesses.

103. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from Williams.

104. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from Leo LNU.

105. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from Julie LNU.

106. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from Rhonda LNU.

107. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from Mary LNU.

108. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from John Doe.

109. In response to Williams's First Report of Discrimination, Defendant did not get a written statement from witnesses.

110. Defendant did not investigate Williams's First Report of Discrimination.

111. Defendant did not give Leo LNU a verbal warning as a result of the First Report of Discrimination.

112. Defendant did not give Leo LNU a written warning as a result of the First Report of Discrimination.

113. Defendant did not give Leo LNU a final warning as a result of the First Report of Discrimination.

114. Defendant did not give Leo LNU a suspension as a result of the First Report of Discrimination.

115. Defendant did not give Leo LNU a demotion as a result of the First Report of Discrimination.

116. Defendant did not terminate Leo LNU's employment as a result of the First Report of Discrimination.

117. Defendant did not discipline Leo LNU at all as a result of the First Report of Discrimination.

118. Defendant did not give Julie LNU a verbal warning as a result of the First Report of Discrimination.

119. Defendant did not give Julie LNU a written warning as a result of the First Report of Discrimination.

120. Defendant did not give Julie LNU a final warning as a result of the First Report of Discrimination.

121. Defendant did not give Julie LNU a suspension as a result of the First Report of Discrimination.

122. Defendant did not give Julie LNU a demotion as a result of the First Report of Discrimination.

123. Defendant did not terminate Julie LNU's employment as a result of the First Report of Discrimination.

124. Defendant did not discipline Julie LNU at all as a result of the First Report of Discrimination.

125. Defendant did not give Rhonda LNU a verbal warning as a result of the First Report of Discrimination.

126. Defendant did not give Rhonda LNU a written warning as a result of the First Report of Discrimination.

127. Defendant did not give Rhonda LNU a final warning as a result of the First Report of Discrimination.

128. Defendant did not give Rhonda LNU a suspension as a result of the First Report of Discrimination.

129. Defendant did not give Rhonda LNU a demotion as a result of the First Report of Discrimination.

130. Defendant did not terminate Rhonda LNU's employment as a result of the First Report of Discrimination.

131. Defendant did not discipline Rhonda LNU at all as a result of the First Report of Discrimination.

132. Defendant did not give Mary LNU a verbal warning as a result of the First Report of Discrimination.

133. Defendant did not give Mary LNU a written warning as a result of the First Report of Discrimination.

134. Defendant did not give Mary LNU a final warning as a result of the First Report of Discrimination.

135. Defendant did not give Mary LNU a suspension as a result of the First Report of Discrimination.

136. Defendant did not give Mary LNU a demotion as a result of the First Report of Discrimination.

137. Defendant did not terminate Mary LNU's employment as a result of the First Report of Discrimination.

138. Defendant did not discipline Mary LNU at all as a result of the First Report of Discrimination.

139. Defendant did not give John Doe a verbal warning as a result of the First Report of Discrimination.

140. Defendant did not give John Doe a written warning as a result of the First Report of Discrimination.

141. Defendant did not give John Doe a final warning as a result of the First Report of Discrimination.

142. Defendant did not give John Doe a suspension as a result of the First Report of Discrimination.

143. Defendant did not give John Doe a demotion as a result of the First Report of Discrimination.

144. Defendant did not terminate John Doe's employment as a result of the First Report of Discrimination.

145. Defendant did not discipline John Doe at all as a result of the First Report of Discrimination.

146. In or about October 2019, Defendant got rid of its box trucks at the Marysville Location.

147. In or about October 2019, Defendant required CDL drivers to drive trucks with open-air trailers ("New Trucks").

148. Defendant did not train Williams on the safety requirements for the New Trucks.

149. Defendant trained Williams's similarly-situated non-African-American coworkers on the safety requirements for the New Trucks.

150. Because of Williams's race, Defendant did not train Williams on the safety requirements for the New Trucks.

151. Because of Williams's opposition to discrimination, Defendant did not train Williams on the safety requirements for the New Trucks.

152. Defendant's failure to train Williams on the safety requirements for the New Trucks was an adverse action.

153. Defendant's failure to train Williams on the safety requirements for the New Trucks was an adverse employment action.

154. Defendant intentionally failed to train Williams on the safety requirements for the New Trucks.

155. Defendant willfully failed to train Williams on the safety requirements for the New Trucks.

156. Defendant provided plastic straps for Williams to use to secure cargo to his trailer.

157. Defendant did not provide materials other than the plastic straps for Williams to use to secure cargo to his trailer.

158. The plastic straps provided by Defendant could not safely secure cargo to Williams's trailer.

159. In or about October 2019, Williams told Rhonda LNU that the plastic straps provided by Defendant could not safely secure cargo to Williams's trailer ("October Safety Report").

160. Williams made the October Safety Report because he was concerned about his safety.

161. Williams made the October Safety Report because he was concerned about the safety of the public.

162. In response to the October Safety Report, Rhonda LNU responded, "Oh, they'll be fine."

163. In response to the October Safety Report, Defendant took no action to remedy Williams's safety concerns.

164. In or about November 2019, Williams told Rhonda LNU that the plastic straps provided by Defendant could not safely secure cargo to Williams's trailer ("November Safety Report").

165. Williams made the November Safety Report because he was concerned about his safety.

166. Williams made the November Safety Report because he was concerned about the safety of the public.

167. In response to the November Safety Report, Defendant took no action to remedy Williams's safety concerns.

168. In or about early December 2019, Williams made a written report to Evans that the plastic straps provided by Defendant could not safely secure cargo to Williams's trailer ("December Safety Report").

169. Williams made the December Safety Report because he was concerned about his safety.

170. Williams made the December Safety Report because he was concerned about the safety of the public.

171. In response to the December Safety Report, Defendant took no action to remedy Williams's safety concerns.

172. In or about early December 2019, Williams made a written report to Evans that he was facing discrimination on the basis of his race.

173. On or about January 9, 2020, Defendant terminated Williams's employment ("Termination").

174. On or about January 9, 2020, Defendant's store manager, Amanda (Last Name Unknown) informed Williams about the Termination.

175. On or about January 9, 2020, Amanda LNU alleged that the reason for the Termination was that an item fell off Williams's trailer ("Termination Excuse").

176. In the October Safety Report, Williams complained that he was concerned that items would fall off his trailer.

177. After the October Safety Report, Defendant took no action to remedy Williams's safety concerns.

178. In the November Safety Report, Williams complained that he was concerned that items would fall off his trailer.

179. After the November Safety Report, Defendant took no action to remedy Williams's safety concerns.

180. In the December Safety Report, Williams complained that he was concerned that items would fall off his trailer.

181. After the December Safety Report, Defendant took no action to remedy Williams's safety concerns.

182. During Williams's time working for Defendant, a forklift operator, Keith (Last Name Unknown) caused multiple forklift accidents.

183. Keith LNU is Caucasian.

184. Defendant did not terminate Keith LNU for his accidents.

185. During Williams's time working for Defendant, a forklift operator, Nick (Last Name Unknown) caused multiple forklift accidents.

186. Nick LNU is Caucasian.

187. Defendant did not terminate Nick LNU for his accidents.

188. The Termination Excuse was not the real reason for the Termination.

189. The Termination Excuse was not a sufficient basis to justify the Termination.

190. Defendant knowingly terminated Williams's employment.

191. Defendant knowingly took an adverse employment action against Williams.

192. Defendant knowingly took an adverse action against Williams.

193. Defendant intentionally terminated Williams's employment.

194. Defendant intentionally took an adverse employment action against Williams.

195. Defendant intentionally took an adverse action against Williams.

196. Defendant knew that terminating Williams would cause Williams harm, including economic harm.

197. Defendant willfully terminated Williams's employment.

198. Defendant willfully took an adverse employment action against Williams.

199. Defendant willfully took an adverse action against Williams.

200. On or about January 9, 2020, Defendant terminated Williams's employment because of his race.

201. On or about January 9, 2020, Defendant terminated Williams's employment because he opposed race discrimination.

202. On or about January 9, 2020, Defendant terminated Williams's employment because he reported safety concerns.

203. As a direct and proximate result of Defendant's conduct, Williams suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

204. Williams restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

205. Throughout his employment, Williams was fully competent to perform his essential job duties.

206. Defendant treated Williams differently than other similarly-situated employees based on his race.

207. Defendant violated Title VII by discriminating against Williams due to his race.

208. On or about January 9, 2020, Defendant terminated Williams without just cause.

209. At all times material herein, similarly-situated non-African-American employees were not terminated without just cause.

210. Defendant terminated Williams based on his race.

211. Defendant violated Title VII when it terminated Williams based on his race.

212. As a direct and proximate result of Defendant's conduct, Williams has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.*

213. Williams restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

214. Throughout his employment, Williams was fully competent to perform his essential job duties.

215. Defendant treated Williams differently than other similarly-situated employees based on his race.

216. Defendant violated R.C. § 4112.02(A) *et seq.* by discriminating against Williams due to his race.

217. On or about January 9, 2020, Defendant terminated Williams without just cause.

218. At all times material herein, similarly-situated non-African-American employees were not terminated without just cause.

219. Defendant terminated Williams based on his race.

220. Defendant violated R.C. § 4112.01 *et seq.* when it terminated Williams based on his race.

221. As a direct and proximate result of Defendant's conduct, Williams has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT III: RETALIATION IN VIOLATION OF TITLE VII

222. Williams restates each and every prior paragraph of this complaint, as if it were fully restated herein.

223. As a result of Defendant's discriminatory conduct described above, Williams complained about the race discrimination he was experiencing.

224. Subsequent to Williams's reporting of discrimination to Evans, Defendant required Williams to drive the New Trucks without training.

225. Subsequent to Williams's reporting of discrimination to Evans, Defendant terminated Williams's employment.

226. Defendant's actions were retaliatory in nature based on Williams's opposition to the unlawful discriminatory conduct.

227. Pursuant to Title VII, it is an unlawful discriminatory practice to retaliate against a person who opposes unlawful discrimination.

228. As a direct and proximate result of Defendant's conduct, Williams suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT IV: RETALIATION IN VIOLATION OF R.C. § 4112.01 *et seq.*

229. Williams restates each and every prior paragraph of this complaint, as if it were fully restated herein.

230. As a result of Defendant's discriminatory conduct described above, Williams complained about the race discrimination he was experiencing.

231. Subsequent to Williams's reporting of discrimination to Evans, Defendant required Williams to drive the New Trucks without training.

232. Subsequent to Williams's reporting of discrimination to Evans, Defendant terminated Williams's employment.

233. Defendant's actions were retaliatory in nature based on Williams's opposition to the unlawful discriminatory conduct.

234. Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

235. As a direct and proximate result of Defendant's conduct, Williams suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT V: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

236. Williams restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

237. A clear public policy exists and is manifested in federal and/or Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

238. A clear public policy exists and is manifested in federal and/or Ohio statutes and/or administrative regulations, including 49 C.F.R. § 393.100 *et seq.*, or in the common law, requiring securing of cargo on commercial vehicles.

239. A clear public policy exists and is manifested in federal and/or Ohio statutes and/or administrative regulations, including R.C. §§ 4101.11 and 4101.12, or in the common law, requiring employers to furnish a safe environment for employees and frequenters.

240. Defendant's termination of Williams jeopardizes these public policies.

241. Defendant's termination of Williams was motivated by conduct related to these public policies.

242. Defendant had no overriding business justification for terminating Williams.

243. As a direct and proximate result of Defendant's conduct, Williams has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Williams respectfully requests that this Honorable Court grant the following relief:

(a) Issue an order requiring Defendant retroactively to restore Williams to one of the positions to which he was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against Defendant of compensatory and monetary damages to compensate Williams for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against Defendant in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Williams's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*_____
Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com
*Attorneys for Plaintiff Cenica Williams*

## JURY DEMAND

Plaintiff Williams demands a trial by jury by the maximum number of jurors permitted.

*/s/ Trisha Breedlove*_____
Trisha Breedlove (0095852)
Paul Filippelli (0097085)